**Olympic Paper Co. v. Dubin Paper Co.**

*Anthony Beldecos,* for plaintiff.
*Louis Hackman,* for defendants.

SHEPPARD JR., *J.,* December 29, 2000—Plaintiff-petitioner, Olympic Paper Company, seeks to partially enforce a restrictive covenant against its former employee, defendant-respondent Brian Reddy, and Reddy's new employer, defendant-respondent Dubin Paper Company. In its petition for a preliminary injunction, Olympic seeks to enjoin Reddy and Dubin from soliciting any Olympic customers within a 150-mile radius for a period of one year.[1] In addition, Olympic requests that

---

1. Olympic does not seek to prevent Reddy from working at Dubin or in the paper business generally, but it merely seeks to prevent Reddy

defendants be ordered to return all price lists, client folders, orders, notes and other confidential materials removed from Olympic on the ground that this information merits protection as a trade secret and/or confidential information.

This court grants the petition, in part, and enjoins Reddy, Dubin, and those acting in concert with them, for a period of six months, from soliciting, contacting or otherwise engaging in business relations with the 14 businesses with which Reddy established and/or maintained relationships while employed as a sales representative at Olympic. Further, this court orders Reddy to return to Olympic any of Olympic's files and/or property currently in his possession.

The court submits the following findings of fact, discussion and conclusions of law in support of its contemporaneous order.

## FINDINGS OF FACT

### I. *The Parties*

(1) Olympic engages in the business of selling disposable paper products primarily for restaurant and food service clientele. (N.T.[2] 7, 10.)

---

from soliciting Olympic's business. (N.T. 16-17.) Following the preliminary injunction hearing, Olympic modified its original request for injunctive relief and now seeks to preliminarily enjoin Reddy and those acting in concert with him from directly or indirectly soliciting business from 29 customers of Olympic until September 15, 2001, and to return to Olympic any price lists or company documents based on the restrictive covenant in the employment agreement between Reddy and Olympic. See proposed order, attached to pet'r. post hearing mem. of law.

2. All references to Notes of Testimony are to the November 30, 2000 preliminary injunction hearing in courtroom 513, City Hall.

(2) Olympic is currently located at 7500 State Road, Philadelphia, PA and transacts business in a geographic radius of 100 miles, including locations in Delaware, Maryland and northern New Jersey. (N.T. 7-8, 77.)

(3) Olympic's sales for last year were $8.75 million and it obtains its customers primarily through solicitation and from referrals from other satisfied customers. (N.T. 11.)

(4) Olympic currently has five full-time sales persons, but it had employed approximately eight salespersons including Brian Reddy prior to terminating Reddy and others. (N.T. 15-16, 60-61.)

(5) Dubin is a direct competitor of Olympic in the paper business, which business is highly competitive and price and quality sensitive. (N.T. 14-15.)

(6) Reddy had been employed by Olympic since 1995, first, in the capacity of a truck driver, then a customer service representative, then purchasing agent, and then as a sales representative from April 2000 until he was terminated on or about September 15, 2000.[3] (N.T. 18-21.)

(7) Approximately three weeks following his termination from Olympic, Reddy began working as a sales representative for Dubin. (N.T. 111-13.)

---

3. As a customer service representative, Reddy's duties involved answering the telephone, taking orders and processing customer complaints. He also had access to the computer. Further, as purchasing agent Reddy's duties involved maintaining inventory, reviewing pricing, making computer entries and processing orders. Both customer service people and purchasing agents had access to the computer where price lists and customer names were kept, but neither position required signing a noncompete agreement, unlike the sales representatives. (N.T. 19-21, 54-56, 76-77.)

## II. *The Employment Agreement*

(8) In the fall of 1999, Reddy had expressed the desire to become a sales representative, which would provide an opportunity to increase his income depending on how much business he would generate, since sales representatives are paid 60 percent straight commission and they generally make more money by bringing in more business. (N.T. 21-23.)

(9) On or about November 1, 1999, Reddy received a letter from Olympic's management which provided details on the compensation package involved in a sales representative position. Both Reddy and Olympic's management executed this letter. (N.T. 25-26; and attachment to exhibit P-1.)[4]

(10) In April 2000, Reddy unofficially began his position as a sales representative of Olympic when he attended four separate sales "blitzes" at the New Jersey shore.[5] (N.T. 90, 94-95.)

(11) In connection with this change in his job assignment, Reddy was informed that he would have to sign a noncompete agreement in order to work as a sales representative for Olympic. There is no evidence that Reddy would be fired if he did not sign the noncompete agreement. (N.T. 48-49, 90.)

(12) Shortly after he began work as a sales representative on May 5, 2000, Reddy signed an employment agreement, which was also signed by Stephen Hottinger,

---

4. Exhibits referred to are those exhibits presented during the hearing on November 30, 2000.

5. Reddy had also made some sales in his previous positions when he took orders over the telephone. (N.T. 47-48.)

who was then the director of sales and marketing for Olympic. (N.T. 26, 90-91; exhibit P-1.)

(13) The agreement contained clauses relating to confidential information and including a restrictive covenant, which states in pertinent part:

"(4) *Property Of Employer* . . .

"(a) All past, present and future customers of [Olympic] which are not heretofore defined as [Reddy's] property, price books, catalogues, customer lists and records, samples, and all other data relative to [Reddy's] relationship with its customers, suppliers and competitors *are the property of the employer.* All printed material hereunder are subject to recall at any time by [Olympic], and upon such recall will be surrendered by [Reddy]. Upon termination, all such material will be surrendered by [Reddy] forthwith, without any further notice.

"(5) *Covenant Not To Compete:* [Reddy] hereby covenants that he . . . presently is not, and that during the term of this agreement *and* for the next one year following the termination of the employment[,] this agreement, or any extension thereof:

"(a) That [Reddy] will not become involved either directly or indirectly, whether as owner, partner, director, officer, agent, representative or employee of a business entity, or any enterprise which is engaged in substantially the same business as [Olympic] *and* solicit business from [Olympic's] customers who have locations within [Olympic's] trading area;

"(b) [Reddy] will not reveal or in any manner divulge [Olympic's] trade secrets as defined hereinabove;[6]

---

6. The agreement defines "trade secrets" as including the "sales methods, customer lists, and other data relative to [Olympic's] relation-

"(c) [Reddy] will not engage in any business activity which is in contravention of the foregoing covenants, whether as an owner, director, officer, agent, representative or employee of such competing business entity *within a radius of 150 miles* of [Olympic's] place of business at 7500 State Road, Philadelphia, Pennsylvania . . . ." (Exhibit P-1, at 3.)

(14) The agreement also provided that Reddy received a "sign-on bonus" of $100 paid by Olympic, as consideration for the recitals in the agreement and for becoming a sales representative. (*Id.* at 1.)

(15) Reddy claims that he never received this $100 bonus or any additional consideration for signing the agreement. (Def. mem. of law, at 7-8.) Louis Ballas, salesman and part owner of Olympic, testified that Reddy may not have literally received this money, but he did receive an equivalent benefit because Olympic had forgiven a debt owed to it by Reddy. (N.T. 44-45; 102-103.) In addition, Reddy's income had potential to increase and did increase after he became a sales representative. (*Id.* at 106-108.)

(16) The terms of the agreement were non-negotiable. (N.T. 49.)

### III. *Reddy's Position As Olympic's Sales Representative*

(17) As a sales representative, Reddy received a price list, a sales book and a customer history list which included the identity of the customer, what the customer

---

ships with its customers, suppliers and competitors . . . ." (Exhibit P-1, at 1.)

paid and what the customer bought. (N.T. 26-27, 73-74.)

(18) Prior to being assigned a sales territory, Reddy was introduced to various customers by Louis Ballas or others in order to become familiar with these customers. (N.T. 12, 38.)

(19) Reddy was first assigned 11 accounts as his initial sales territory. These accounts had been Louis Ballas' accounts. (N.T. 37, 73-74, 144-46.)

(20) These first 11 accounts are: Wunderbar, Classic Sub/Pizza, Mount Airy Best, Mystic Pizza, Oak Lane Pizza, Alladin Pizza, Stenton Pizza, Giovanni Pizza, Penrose Diner, Teddy's Pizza Express, and Dwight's BBQ. (Exhibit P-2 (nos. 1-11).)[7]

(21) Two other accounts, Pizza Station and Victoria's, were later assigned to Reddy when another salesman left. (N.T. 144; exhibit P-2 (nos. 12-13).)

(22) Reddy also opened an account at Randazzo's when he was a sales representative at Olympic. (N.T. 145-46; exhibit P-2 (no. 26).)[8]

---

7. Exhibit P-2 purports to represent the 30 Olympic customers with whom Reddy had some contact on behalf of Dubin. (N.T. 69-70, 81.) However, Olympic admits that Carambola (no. 27 on the list) belongs to Reddy because it is his brother-in-law. (*Id.* at 81-83.) As testified by Louis Ballas, Reddy had not obtained any of the 30 customers on his own, except for Carambola. (*Id.* at 37-38.)

8. Reddy also testified that he opened two other accounts, Sea Grille and Land Mark Wholesale, when he was a customer service representative. (N.T. 144-45.) This court, however, is concerned only with those accounts which Reddy had established or maintained in his role as sales representative and not from his previous positions, since the restrictive covenant only came into effect once Reddy became a sales representative. For this same reason, this court is not concerned with

(23) Testimonial evidence demonstrates that the success of any Olympic sales representative depended upon his or her personal relationship with customers and the level of familiarity and comfort between the salesperson and the customer. (N.T. 12-13.)[9]

(24) Olympic claims that, although Reddy had talent to be a good sales representative, he was terminated for poor performance by not bringing in new business, by not visiting his customers and by not collecting money owed to Olympic. (N.T. 40-42, 96, 110.) Olympic had also purportedly contemplated firing Reddy when he was a purchasing agent. (*Id.* at 58-59.)

(25) Reddy was terminated on September 15, 2000, but there is no evidence, other than testimonial evidence, that he was fired for poor performance. (N.T. 65-66.)

## IV. *Reddy's Actions Following His Termination*

(25) Olympic claims that Reddy did not return Olympic's price list after he was terminated. (N.T. 95.) However, it remains unclear whether Reddy took any confidential documents with him when he left Olympic's employ.

---

the Area Foods's account (no. 14 on the list) since Area Foods was a "pick-up customer" who would come to Olympic's location and salesman would not have to actively visit it. (N.T. 86-87.)

9. For example, Ibrahim Elzayar of Manhattan Pizza testified that he would give his business to Reddy, whether at Olympic or at Dubin, because he felt more comfortable with Reddy, even though he had been an Olympic customer before Reddy was an employee of Olympic. (N.T. 113-14, 118-19.) This court will not now interfere with Mr. Elzayar's freedom to choose to whom he wants to send his business. His testimony does, however, demonstrate the need to develop a comfort level with one's customers.

(26) Approximately three weeks following his termination from Olympic, Reddy began working as a full-time salesperson at Dubin. (N.T. 111-13.)

(27) While at Dubin, Reddy has contacted or attempted to contact at least 20 of Olympic's customers. (N.T. 137-38.)[10]

(28) There is no evidence that Reddy had spread any disparaging rumors regarding Olympic after it fired him. Rather, rumors regarding Olympic's financial trouble had started when Reddy was still employed by Olympic. There is no evidence that Reddy initiated these rumors. (N.T. 63-65.)

(29) There is no evidence that Olympic's sales decreased after Reddy was terminated. Rather, profits appear to be rising because Olympic has been cutting costs. (N.T. 61-62.)

(30) Olympic's sales force has been reduced since Reddy was terminated. There is no evidence that Olympic is contemplating hiring any new sales persons in the future. (N.T. 60-62.)

## DISCUSSION

This court now holds that Olympic has demonstrated that Reddy has breached the restrictive covenant by actively soliciting those Olympic customers whom Reddy

---

10. Specifically, Reddy admitted to speaking with the following customers: Wunderbar, Stenton Pizza, Victoria's, Rising Sun, Sea Grille, Juliano's, Mr. Pizza, Tananno's, Mario's Market, Mario's Catering, Manhattan Pizza, Shef's Pizza, Randazzo's, Carambola, Gatto Pizza, Land Mark Wholesale and Country Pizza (respectively nos. 1, 7, 13, 16, 17, 18, 19, 21-30 of exhibit P-2; N.T. 137.) Reddy also admitted to attempting to speak with other customers. *Id.*

had maintained on Olympic's behalf. However, the restrictive covenant is overbroad as written and will be modified to limit its geographic scope and duration in order to protect only Olympic's legitimate business interests.

Thus, this court now enjoins Reddy and those acting in concert with him from soliciting or otherwise contacting any of the fourteen customers that Reddy, as a sales representative, had maintained on Olympic's behalf for a period of six months.

I. *This Court May Enforce the Restrictive Covenant Through a Preliminary Injunction to the Extent Necessary To Protect Customer Relationships That Reddy Established or Maintained for Olympic*

A. Standard of Review for
Enforcing Restrictive Covenants

This court must first determine whether the non-compete agreement, as a post-employment restrictive covenant, is enforceable. A restrictive covenant may only be enforced at equity if: (1) it is ancillary to an employment relationship between the parties to the covenant, (2) it is reasonably limited in duration and geographic scope, and (3) it is necessary to protect a legitimate business interest of the employer without imposing an undue hardship on the employee. *John G. Bryant Co. Inc. v. Sling Testing & Repair Inc.*, 471 Pa. 1, 9-10, 369 A.2d 1164, 1168 (1977); *Boldt Machinery & Tools Inc. v. Wallace,* 469 Pa. 504, 511, 366 A.2d 902, 906 (1976); *Sidco Paper Co. v. Aaron,* 465 Pa. 586, 591, 351 A.2d 250, 252 (1976); *All-Pak Inc. v.*

*Johnston,* 694 A.2d 347, 350 (Pa. Super. 1997); *Thermo-Guard Inc. v. Cochran,* 408 Pa. Super. 54, 64, 596 A.2d 188, 193 (1991). If the restrictive covenant meets this three-part test for reasonableness, it is prima facie enforceable at equity. *John G. Bryant,* 471 Pa. at 8, 369 A.2d at 1167 (citing *Bettinger v. Carl Berke Associates Inc.,* 455 Pa. 100, 103, 314 A.2d 296, 298 (1974)). The employee bears the burden of establishing the unreasonableness of the covenant and demonstrating how it is unenforceable. *Id.* at 12, 368 A.2d at 169. In addition, the court must consider all the facts and circumstances on a case-by-case basis. *Insulation Corp. of America v. Brobston,* 446 Pa. Super. 520, 530, 667 A.2d 729, 733-34 (1995).

B. The Restrictive Covenant of the Employment Agreement Is Ancillary to the Employment Relationship and Is Supported by Adequate Consideration

To be ancillary to the employment relationship, a covenant must be supported by adequate consideration, which can be in the form of a corresponding benefit or a beneficial change in employment status. *Id.* at 529, 667 A.2d at 733. In *Brobston,* the court concluded that the restrictive covenant was supported by adequate consideration in the form of the employee's annual raise and change in employment status from "at-will" to a written year-to-year term. *Id.* Restrictive covenants are ancillary to the taking of regular employment and supported by valid consideration, as long as they are "not an afterthought to impose additional restrictions on the unsuspecting employee." See *Beneficial Finance Co.*

*of Lebanon v. Becker,* 422 Pa. 531, 536, 222 A.2d 873, 876 (1966) (holding that restrictive covenant was ancillary to the taking of employment when all of the employees were required to sign such contracts and contract was prepared the day defendant-employee started his employment, despite that defendant signed the contract two days after starting work and plaintiff did not accept the contract until nine days later).

The circumstances presented here demonstrate that the restrictive covenant does not constitute an impermissible "afterthought," and was supported by consideration since Reddy was required to sign the employment agreement in order to become a sales representative. The agreement explicitly provided that Reddy received $100 as a "sign-on bonus" when he signed it. (Exhibit P-1, at 1.) Even if Reddy had not literally received this money, testimonial evidence demonstrates that Reddy received an equivalent benefit because Olympic forgave part of Reddy's debt owed to it. (N.T. 44-45.) Moreover, the record demonstrates that sales representatives had the potential to increase their income if they generated more business. Therefore, the agreement's restrictive covenant was ancillary to Reddy's change in his job position. As such, it meets the first part of the reasonableness test.

### C. The Covenant Will Be Reasonable in Duration and Geographic Scope Once the Court Modifies It to the Extent Necessary To Protect Olympic's Legitimate Interests

The reasonableness of the duration and geographic aspects of a restrictive covenant must be determined in

light of the nature of the employer's interest sought to be protected. *Boldt Machinery & Tools,* 469 Pa. at 513, 366 A.2d at 907. Where the restrictive covenant is sought to protect customer relationships, the duration is considered reasonable "if it is no longer than necessary for the employer to put a new man on the job and for the new employee to have a reasonable opportunity to demonstrate his effectiveness to the customers." *Id.* (quoting Blake, *Employee Covenants Not To Compete,* 73 Harv.L.Rev. 625, 677-78 (1960)). See also, *Robert Clifton Associates Inc. v. O'Connor,* 338 Pa. Super. 246, 255, 487 A.2d 947, 952 (1985). (citations omitted) Generally, a new employee needs less time to demonstrate his effectiveness in industries involving frequent client contact and more time in industries involving infrequent contact. *Boldt Machinery & Tools,* 469 Pa. at 513, 366 A.2d at 907 (quoting Blake's article). Further, when the employment relationship is complex, a longer period may be called for to demonstrate effectiveness versus when the relationship is relatively simple. *Id.* In addition, "[c]ourts seldom criticize restraints of six months or a year on the grounds of duration as such, and even longer restraints are often enforced." *Id.* See *Bettinger v. Carl Berke Associates Inc.,* 455 Pa. 100, 103-104, 314 A.2d 296, 298 (1974) (holding that one-year restrictive covenant in contract of former employee of temporary employment agency was reasonable); *Robert Clifton Associates,* 339 Pa. Super. at 255, 487 A.2d at 952 (same).

In addition, Pennsylvania courts of equity, when enforcing restrictive covenants, may limit the geographic scope to the extent which is reasonably necessary for

the protection of the employer. *Sidco Paper Co.,* 465 Pa. at 595, 351 A.2d at 254; *Thermo-Guard,* 408 Pa. Super. at 65-66 n.9, 596 A.2d at 194 n.9; *Quaker City Engine Rebuilders Inc. v. Toscano,* 369 Pa. Super. 573, 584-85, 535 A.2d 1083, 1089 (1987) (stating "an otherwise valid restrictive covenant which is *geographically* overbroad is 'divisible and enforceable [once it has been limited by the court] to reasonable geographical limits.' ").

Moreover, recently, this court in *Robert Half of PA Inc. v. Feight,* 48 D.&C.4th 129 (Phila. Cty. 2000) (Herron, J.), limited its enforcement of the restrictive covenants to those 16 law firms of which Feight, the defendant-employee, had personally established the good will with her former employer, RHI, despite that Feight had dealt with 260 clients at RHI but had not established a relationship on RHI's behalf with the 744 remaining firms. *Id.* at 151-52, 161-62. This court concluded that "[t]his modification will achieve a proper balance between protecting RHI's interests and not imposing an undue hardship on Feight." *Id.* at 162.

Here, on its face, the restrictive covenant imposes a one-year restriction following termination of employment and limits the geographic scope to within 150 miles of Olympic's place of business at 7500 State Road, Philadelphia, PA. (Exhibit A, at 3.) On its face, the covenant seems broader than necessary to protect Olympic's legitimate interests. Further, Olympic, in its modified request for injunctive relief, seeks only to enjoin Reddy and those acting in concert with him from soliciting 29 customers of Olympic for a period of one year following his termination from Olympic. (See proposed

order attached to pet'r. post-hearing mem. of law.) Therefore, it appears that even Olympic concedes that its original request was too broad. In addition, Reddy was only in his job as a sales representative for a period of approximately five months. It is not reasonable that the covenant should be enforced for a period of time inordinately longer than the time during which Reddy was working as sales representative.

Therefore, this court will enjoin Reddy and those working in concert with him from soliciting customers for a period of only six months from the date of his termination, and defendants will only be enjoined from soliciting only those customers with whom Reddy had personally established good will on Olympic's behalf. Thus, the restrictive covenant, as modified, meets the second part of the reasonableness test.

## D. Olympic Has Shown a Legitimate Business Interest in Protecting its Customer Relationships Maintained by Reddy but Has Failed To Show that its Price Lists Deserve Trade Secret Protection or Protection As Confidential Information

The primary issue which remains is whether the restrictive covenant is necessary to protect Olympic's legitimate business interests. Pennsylvania courts have determined that trade secrets of an employer, customer good will and specialized training and skills gained from the employer do constitute legitimate interests that are protectible through a general restrictive covenant. *Thermo-Guard*, 408 Pa. Super. at 65, 596 A.2d at 193-94. See also, *Sidco Paper Co.*, 465 Pa. at 590-94; *Morgan's Home Equip. Corp. v. Martucci,* 390 Pa. 618,

631-32, 136 A.2d 838, 846 (1957). Olympic, primarily, is seeking to protect its customer good will and preserving its established business relationships. (Pet'r. mem. of law, at 1-2.) Olympic is also trying to implicate an interest in protecting its "trade secrets," by compelling the return of any "confidential" documents which may include documents relating its sales methods, customer lists and other information. (See *id.* at 2.)

The Pennsylvania Supreme Court has repeatedly upheld the employer's right to protect, by noncompetition and nonsolicitation agreements, an interest in customer good will acquired through the efforts of the employee. See *e.g., John G. Bryant Co.*, 471 Pa. at 8-10, 369 A.2d at 1168; *Sidco Paper Co.*, 465 Pa. at 590-92, 351 A.2d at 252-53; *Morgan's Home Equip. Corp.*, 390 Pa. at 631-32, 136 A.2d at 846. Moreover, in *Feight*, the Honorable John W. Herron recognized the importance of protecting the employer's business relationships that were established by the employee, especially where the employer's sole or major contact with its customers is through that employee. *Id.* at 150-51. In that case, this court emphasized that the employer's right to protection is especially applicable to the employee placement field which is highly competitive and requires frequent contact with customers to maintain the strength of the relationships. *Id.* at 150. This court thus enjoined, for one year, the former employee-defendant from soliciting, contacting or otherwise engaging in business relations with the 16 law firms that she had the most significant contact while at her former employment and which were in a 50-mile radius of the plaintiff. *Id.* at 151-52.

Here, Olympic originally sought very broad relief. In its modified request, Olympic seeks to enjoin defendants from soliciting 29 of its customers for a period of one year. (Pet'r. proposed order attached to pet'r. post-hearing mem. of law.) While it is clear under Pennsylvania law that protecting customer good will is a legitimate business interest, the record here demonstrates that Reddy established and/or maintained relations with only 14 customers of Olympic. This number reflects the 11 accounts assigned as Reddy's original sales territory, the two accounts added to his sales territory and the other account he generated as a sales representative. Any other accounts which Reddy may or may not have obtained himself did not derive from his position as a sales representative of Olympic. Rather, he generated them in his previous positions at Olympic, or these accounts were generated by others. The relevant time period and effect of the restrictive covenant comes into play only after Reddy became a sales representative. It is clear that Olympic has a legitimate business interest in protecting those customer relationships nurtured by Reddy on Olympic's behalf.

The court reaches this conclusion despite defendants' argument that Reddy cannot be construed as a threat to these interests because he was purportedly fired for "poor performance." As support, defendants rely upon *All-Pak Inc. v. Johnston*, 694 A.2d 347 (Pa. Super. 1997) and *Insulation Corp. of America v. Brobston*, 446 Pa. Super. 520, 667 A.2d 729 (1995). In *All-Pak*, the trial court had found that because the employee was terminated unilaterally, the employer's right to a preliminary injunction was unclear in light of the recent

decision in *Brobston.* 694 A.2d at 352. In that case, the appellate court affirmed the lower court's denial of a preliminary injunction to enforce a restrictive covenant. *Id.* However, the *All-Pak* decision turned mostly on the fact that the employment contract did not contain an assignment clause and policy considerations against allowing a successor employer to enforce a restrictive covenant. The court did not hold that the firing of an employee bars the employer's right to injunctive relief. *Id.* The *All-Pak* court, citing *Brobston,*[11] stated the following:

"We held that the fact that the employee was terminated, rather than quit voluntarily, was an important factor when considering the enforceability of a restrictive covenant. On the facts in that case, we determined that it was inequitable for the employer to obtain an injunction against the employee. . . . We emphasized, however, that the reasonableness of enforcing such a restriction is determined on a case by case basis. Thus, the mere termination of an employee would not serve to bar the employer's right to injunctive relief. Where, for instance, an employee intentionally engaged in conduct that caused his termination, . . . the employer's right to injunctive relief would survive. However, where an employer terminated an employee for reasons beyond

11. In *Brobston,* 446 Pa. Super. at 532, 667 A.2d at 735, the court denied the employer's preliminary injunction where the employer had sought to enforce a two-year restrictive covenant because the employer had fired the employee for failure to perform in a manner which promoted the employer's legitimate business interest. The court stated that "it is unreasonable as a matter of law to permit the employer to retain unfettered control over that which it has effectively discarded as worthless to its legitimate business interests." *Id.*

the employee's control, the rule announced in *Brobston* may bar injunctive relief. . . ." *Id.* at 352. (footnotes omitted)

Here the record does not clearly demonstrate exactly why Reddy was terminated. The only evidence that Reddy was terminated because of his poor performance (*i.e.,* his alleged failure to collect money owed to Olympic, his alleged failure to visit customers and his alleged failure to generate new business) was testimonial in nature. (N.T. 40-42, 96, 110.) Even assuming, arguendo, that Reddy was terminated because of his performance, Reddy could have intentionally engaged in this conduct in order to cause his termination and avoid the restrictive convenant. Here, it does not appear that Olympic discarded its rights to protect its customer good will when it terminated Reddy. Rather, the circumstances of this case do weigh in favor of striking a balance between protecting Olympic's customer good will without imposing an undue hardship on Reddy.

However, Olympic has not demonstrated that the information it seeks to protect, mainly its prices and customer lists, is particular or unique to its business and deserves protection as a trade secret or as confidential information. In *Feight*, this court distinguished the need to protect business relations with its legal clients and candidates from protecting the confidentiality of the identities of those clients and candidates and held that the latter were not "trade secrets." *Id.* at 152-53. It stated that "[t]hough confidential customer data may be entitled to protection as a trade secret, 'customer lists [are] at the very periphery' of trade secret law." *Id.* at 153 (citing *Renee Beauty Salons v. Blose-Venable* 438

Pa. Super. 601, 604, 652 A.2d 1345, 1347 (1995)). See also, *Carl A. Colteryahn Dairy v. Schnieder Dairy,* 415 Pa. 276, 283, 203 A.2d 469, 473 (1964) (stating that "[e]quity will not protect mere names and addresses easily ascertainable by observation or reference to directories"); *Fidelity Fund Inc. v. DiSanto,* 347 Pa. Super. 112, 120, 500 A.2d 431, 436 (1985).

Determining whether an employer's customer lists are entitled to protection as trade secrets depends on whether they are "the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged." *Bettinger,* 455 Pa. at 105-106, 314 A.2d at 299. Recently, our Superior Court recognized that customer lists and other data compilations gathered by an employer through a material investment of time and expense may qualify as trade secrets and/or confidential information protectible through injunctive relief. *A.M. Skier Agency Inc. v. Gold,* 747 A.2d 936, 939-40 (Pa. Super. 2000). See also, *Spring Steels Inc. v. Molloy,* 400 Pa. 354, 358-60, 162 A.2d 370, 372-73 (1960) (determining that a former employee may use nonconfidential customer lists gained through general sources although he may not use confidential information peculiar to his employer's business and acquired therefrom); *Harsco Corp. v. Klein,* 395 Pa. Super. 212, 218, 576 A.2d 1118, 1121 (1990) (stating that the identities of the employer's customers were not confidential where those identities "would be generally known to all firms in the same business as" the employer). In addition, the plaintiff-employer bears the burden of demonstrating that the information sought for protection is a trade secret and that the employee misappropriated

the information in violation of the contract or the confidential relationship. *Feight,* 48 D.&C.4th at 153-54 (citing *Fidelity Fund Inc.,* 347 Pa. Super. at 121, 500 A.2d at 436).

Olympic did not demonstrate that it invested time, effort or resources to cultivate its customer list. Nor did Olympic show why and how its prices constitute a trade secret. (See N.T. 30-34.) Rather, this information can be obtained by asking its customers how much they pay for pizza boxes and other paper products, and then, a competitor like Dubin, will seek to beat those prices.[12] (See *id.*) Further, customer service representatives and purchasing agents, who were not under any restrictive covenant, had access to this same information because they had access to the computers. (N.T. 19-21, 54-56, 76-77.) Though Olympic did show that its business was highly competitive and sensitive to prices, this court cannot now conclude that its price lists or customer lists merit protection as a trade secret or as confidential information. Nonetheless, the employment agreement does require the employee to return all of Olympic's property upon termination of the employment. (Exhibit P-1, at 3.) Pursuant to this agreement, Olympic does retain a proprietary interest in its price books, customer lists and other records. *Id.* Therefore, in the interests of reaching an equitable result, Reddy and/or those working in concert with him must return any price books, customer lists or other records which

---

12. This competition for better prices provides another reason for restricting defendants from soliciting certain customers of Olympic and undermining the good will established by Reddy on Olympic's behalf.

rightfully belong to Olympic, so long as Reddy currently has these items in his possession.

## II. *Olympic Is Entitled to a Preliminary Injunction Enforcing the Restrictive Covenant As Modified*

Having resolved that the restrictive covenant meets the three-part test for reasonableness and is prima facie enforceable, this court must still determine whether Olympic is entitled to a preliminary injunction to enforce the covenant. This determination usually turns on the potential for irreparable harm, absent an injunction. *Harsco Corp.,* 395 Pa. Super. at 220, 576 A.2d at 1122 (affirming order denying preliminary injunction where restrictive covenant could not be enforced by a preliminary injunction where plaintiff failed to show likelihood of immediate and irreparable harm).

A preliminary injunction is regarded as "an extraordinary remedy and may only be granted if the plaintiff has established a clear right to the relief sought." *Soja v. Factoryville Sportmen's Club,* 361 Pa. Super. 473, 477, 522 A.2d 1129, 1131 (1987). The purpose of a preliminary injunction is to preserve the status quo as it exists or previously existed before the acts complained of, thus preventing irreparable injury or gross injustice. *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 259, 602 A.2d 1277, 1286 (1992). Further, the moving party must establish the following requisite elements: (1) that relief is necessary to thwart immediate and irreparable harm which could not be remedied by damages; (2) that greater injury will result by refusing the injunction than by granting it; (3) that the injunction will restore the parties to the status quo as it

existed immediately before the alleged wrongful conduct; (4) that the injunction is reasonably suited to abate such activity; and (5) that the plaintiff's right to relief is clear. *School District of Wilkinsburg v. Wilkinsburg Education Association,* 542 Pa. 335, 338 n.2, 667 A.2d 5, 6 n.2 (1995); *Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981); *New Castle Orthopedic Associates v. Burns,* 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978).

These requisite elements "are cumulative, and if one element is lacking, relief may not be granted." *Norristown Municipal Waste Authority v. West Norriton Township Municipal Authority,* 705 A.2d 509, 512 (Pa. Commw. 1998).

Here, Olympic has demonstrated that Reddy violated the restrictive covenant by knowingly soliciting Olympic's customers in violation of the agreement. (N.T. 137-38.) Such proof establishes the requisite element of irreparable harm. As noted by the Pennsylvania Supreme Court,"[i]t is not the initial breach of a covenant which necessarily establishes the existence of irreparable harm but rather the threat of the unbridled continuation of the violation and the resultant incalculable damage to the former employer's business that constitutes the justification for equitable intervention." *John G. Bryant Co.,* 471 Pa. at 7, 369 A.2d at 1167. See also, *Rollins Protective Services Co. v. Shaffer,* 383 Pa. Super. 598, 602, 557 A.2d 413, 415 (1989) (stating that " 'unwarranted interference with customer relationships' would constitute a threat of irreparable harm").

Moreover, the balance of harms waives in favor of granting the injunction since its denial could permit Reddy and Dubin to exploit and undermine certain of Olympic's customer relationships. On the other hand, granting the injunction, as modified, would most likely not prevent Reddy or Dubin from making a living since there appear to be many other companies in Philadelphia, Pennsylvania and the surrounding areas whom they can solicit for the paper business other than those companies whose accounts Reddy had handled on Olympic's behalf. Further, a preliminary injunction where Reddy and Dubin would be prohibited from contacting those companies would restore the status quo that existed before Reddy had contacted them after his employment had ended with Olympic. It seems clear that Olympic should prevail on the merits since Reddy's actions on Dubin's behalf appear to violate the restrictive covenant which is prima facie enforceable in equity, once modified by the court.

## CONCLUSIONS OF LAW

(1) The restrictive covenant was ancillary to Reddy's change in employment status to a sales representative at Olympic and was supported by adequate consideration.

(2) Enforcement of the modified restrictive covenant is necessary to protect the good will that Reddy established with the 14 customers on Olympic's behalf.

(3) The modified restrictive covenant is reasonable in duration and geographic scope.

(4) If Reddy, and those working in concert with him at Dubin continue to solicit Olympic's customers with whom he established relationships on Olympic's behalf

Olympic will suffer immediate and irreparable harm that cannot be compensated by monetary damages.

(5) A greater injury will occur from denying the preliminary injunction than from partially granting the injunction.

(6) An injunction will restore the parties to the status quo as it existed before Reddy's wrongful conduct.

(7) Reddy's solicitation of Olympic's customers is an actionable wrong and an injunction prohibiting Reddy and Dubin from dealing with the 14 customers is reasonably suited to abate that wrong.

(8) Olympic's right to relief is clear.

(9) Olympic's price list and customer lists do not constitute trade secrets and do not deserve protection as confidential information, but Olympic's proprietary interest in these items should be respected. Therefore, Reddy and/or Dubin should return to Olympic those items if any exist in their possession.

(10) These conclusions require that the court partially grant Olympic's petition for preliminary injunction. The court's order prohibits Reddy, Dubin, and those acting in concert with them, from soliciting, contacting or otherwise engaging in business relations with the specifically-named 14 customers until six months after the effective date of Reddy's termination from Olympic on September 15, 2000.[13]

On the basis of the record, the court will enter a contemporaneous order granting in part, and denying in part, the petition for preliminary injunction. The court will

---

13. At the preliminary injunction hearing, the parties stipulated that Reddy's termination date was September 15, 2000. (N.T. 65-66.)

condition the order on Olympic's filing a bond or depositing legal tender with the prothonotary in the amount of $25,000 within five days of the date of this order. Pa.R.C.P. 1531(b).

## ORDER

And now, December 29, 2000, upon consideration of the petition of plaintiff, Olympic Paper Company, for a preliminary injunction, the response of defendants, Brian Reddy and Dubin Paper Company, the respective memoranda and all other matters of record, and after a hearing, it is hereby ordered that the preliminary injunction is granted in part, and denied in part, on the condition that Olympic file a bond or deposit legal tender with the prothonotary in the amount of $25,000 in accordance with Pa.R.C.P. 1531(b) within five days of the date of this order.

In accordance with the findings of fact, discussion and conclusions of law filed contemporaneously in support of this order, Reddy, Dubin, and those acting in concert with them, are enjoined from soliciting, contacting or otherwise engaging in business relations, for six months from Reddy's termination from Olympic Paper Company on September 15, 2000 with the following customers: Wunderbar, Classic Sub/Pizza, Mount Airy Best, Mystic Pizza, Oak Lane Pizza, Alladin Pizza, Stenton Pizza, Giovanni Pizza, Penrose Diner, Teddy's Pizza Express, Dwight's BBQ, Pizza Station, Victoria's, Area Foods and Randazzo's.

It is further ordered that Reddy return to Olympic any documents or materials belonging to Olympic presently in Reddy's possession.